

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**11/04/2014**

| | | |
|---|---|---|
| IN RE: | § | |
| FREDERICK A. ALLEN, JR. | § | |
| JUDY C. ALLEN | § | |
| DEBTOR(S) | § | CASE NO. 13-37143 |
| | § | |
| TRI-TEMP REFRIGERATION, INC. | § | |
| | § | |
| PLAINTIFF(S) | § | ADVERSARY NO. 14-3043 |
| | § | |
| VS. | § | |
| FREDERICK A. ALLEN, JR. | § | |
| JUDY C. ALLEN | § | |
| DEFENDANT(S) | § | |

## Amended Memorandum Opinion

Before the Court is the complaint of Tri-Temp Refrigeration, Inc., to determine dischargeability of its debt under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§157(b) and 1334.

At issue are whether: (1) Tri-Temp Refrigeration, Inc.'s state court judgment and state court findings of fact and conclusions of law preclude relitigation of fraud or breach of fiduciary duty under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4) ; (2) the Texas Construction Trust Fund Act creates a fiduciary duty under 11 U.S.C. §523(a)(4); (3) debtors violated a fiduciary duty under 11 U.S.C. §523(a)(4) by

committing fraud or defalcation, following *Bullock v. BankChampaign, N.A.*, 133
S.Ct. 1754 (2013). After trial and consideration of the testimony and demeanor of the
witnesses and admitted evidence, the Court concludes that Tri-Temp has failed to
bear its burden of proof on all issues. The debt of Tri-Temp Refrigeration, Inc. is
**DISCHARGED.**

## I. Facts

Frederick Allen, Jr. and Judy Allen are officers of Momentum Contractors, Inc.
Fred and Judy Allen filed a chapter 7 bankruptcy petition on November 19, 2013.

On December 22, 2010, Walmart Stores, Inc. contracted with Momentum
Contractors, Inc. to act as general contractor to remodel a Sam's Club located at 2000
Westview Blvd, Conroe, Texas 77304, for $2,243,013.00. Additions and deductions
to the contract price were caused by changes in the scope of work, and the final
contract price increased to $2,391,893.98.[1] Momentum substantially completed the
job by June or July 2011, but to satisfy Walmart's punch list and final walk through
as well as warranty issues, Momentum continued on the job through the following
year.

Momentum's contract with Walmart allocates $699,388.00 to the category
"mechanical." Momentum contracted with Tri-Temp Refrigeration, Inc. for

[1]Net change orders totaled $148,880.98.

$396,000.00, to provide a portion of the mechanical work on the Sam's Club job. Momentum paid Tri-Temp $320,760.00, as follows:

| DATE | AMOUNT |
|------|--------|
| March 31, 2011 | $178,2000 |
| May 31, 2011 | $ 17,820 |
| June 14, 2011 | $124,740 |

During performance of the job, Momentum submitted various change orders to Walmart for approval. Walmart required Momentum to repeatedly revise the change orders Momentum submitted and withheld payment pending its satisfaction with the submissions. Fred Allen testified that during the year that Momentum continued on the Sam's Club job in order to satisfy Walmart's extensive punch list and warranty issues, he negotiated with Walmart concerning all of the open change order requests to attempt to obtain payment from Walmart. While withholding consent to the change orders for work already completed, Walmart pressured Momentum to accept less in payment than Momentum was obligated to pay its subcontractors for the work already performed. Momentum, in turn, tried to negotiate with its subcontractors for reductions on the sums due under their contracts. Fred Allen testified that for one change order, Walmart paid Momentum only $18,000 for work and services performed by Momentum's subcontractors for which Momentum had to

pay the subcontractors over $60,000.

Fred Allen testified that he tried to negotiate with Tri-Temp about the credits
Walmart demanded for Tri-Temp's work, but that "Tri-Temp didn't provide us a lien
release. I'm not even sure they provided a bill until we were readdressing this issue.
They didn't provide us the breakdown we needed to get things straightened out. And
then they were demanding payment and filed suit on us about the same time they gave
us the bill." As late as January 24, 2012, Walmart was demanding a credit of
$50,911.00 on contract payments due Momentum for mechanical work that Tri-Temp
did not perform due to changes to its scope of work, but Tri-Temp would agree to a
credit of only $17,674.00.

In an email dated February 8, 2012, Fred Allen informed Walmart employee
Colleen Callahan that while unpaid subs existed, Momentum had paid out more on
the job than it had received from Walmart. Tri-Temp's counsel questioned Fred Allen
concerning his email to Colleen Callahan and whether he intended to pay
Momentum's subcontractors on the Sam's Club job:

> Q Okay. And you admit in your email that you haven't paid them, right?
> Is that a yes?
>
> A Yes.
>
> Q And you admit that you intend to pay them, as well as the others
> discussed in your previous email to her, right? Do you see at the bottom

of the page?

A Yes.

Q Okay. And so at this point in time in February of 2012 you were dealing with multiple subcontractors, not just my client, that were all trying to get paid, right?

A Yes.

Q Okay. And you were assuring WalMart you were going to take care of them, right?

A Yes --

Q Okay.

A -- as soon as we got funded.

Tri-Temp's counsel questioned Fred Allen further concerning his intent to pay

subcontractors:

Q . . . [Y]ou had already received all of the rest of that money from Walmart, but were overextended on the project, right?

A Yes and no.

Q Well, you had paid out more on the project than you anticipated having to pay out, right?

A Walmart didn't pay the full amount of what they were supposed to pay. We reduced the dollar amount in order to get a settlement and get paid so we could get everybody paid and then they didn't pay.

Fred Allen testified that he "wasn't able to get [the amount due from Walmart

to Momentum] resolved until I just finally decided that -- to take a reduction in order

to get immediate payment so that I could pay everybody. And they got me to agree to the reductions and then they didn't pay." Fred Allen testified that as of the time of trial of the instant matter, two years after conclusion of the job, Walmart still had not paid the final payment due Momentum. Despite Momentum's completing the work to Walmart's satisfaction, Walmart paid Momentum a total of only $2,183,074.54. Walmart owes Momentum $208,819.42 that remains unpaid.

The funds paid by Walmart to Momentum Contractors, Inc. were made by Walmart electronically to an account named "Momentum Contractors Sam's Conroe" set up by Chase Bank at the request of the Allens for the specific purpose of receiving Walmart's payments to Momentum Contractors, Inc. for its work on the Sam's Club project. Unfortunately, in setting up the account, Chase Bank erred by failing to use the correct corporate identification number for Momentum Contractors, Inc., instead using the corporate identification number of another business owned by the Allens, "Momentum Project Controls," a business unrelated to Momentum Contractors, Inc. By the time the Allens noticed the error in the identification number, Walmart had already begun to make deposits to the account. Chase's error made it necessary for the Allens to withdraw every deposit as it was made by Walmart and re-deposit it in an account owned by Momentum Contractors, Inc. with the correct corporate identification number. In addition to payments from Walmart, Momentum

Contractors, Inc. deposited funds into its accounts of more than $1,200,000.00, during the relevant time period from non-Walmart sources. Momentum Contractors, Inc. received the following deposits from Walmart and non-Walmart sources on the dates and in the amounts as follows:

| DATE | ACCOUNT | TOTAL | WALMART | NON-WALMART |
|---|---|---|---|---|
| Mar-11 | 4877 | 98,425.02[1] | 0.00 | 98,425.02 |
| Mar-11 | 4877 | 609,425.31 | 490,364.04[2] | 119,061.31 |
| Apr-11 | 4877 | 75,399.73 | 0.00 | 75,399.73 |
| May-11 | 1245 | 585,915.05 | 585,915.05[3] | 0.00 |
| May-11 | 4877 | 567,369.42 | 450,214.56[4] | 117,154.86 |
| Jun-11 | 4877 | 40,025.35 | 0.00 | 40,025.35 |
| Jun-11 | 1245 | 400,000.00 | 0.00 | 400,000.00 |
| Jul-11 | 4877 | 136,576.54 | 0.00 | 136,576.54 |
| Jul-11 | 1245 | 309,534.16 | 309,534.16[5] | 0.00 |
| Jul-11 | 1245 | 182,683.88 | 182,683.88[6] | 0.00 |
| Aug-11 | 1245 | 0.00 | 0.00 | 0.00 |
| Aug-11 | 4877 | 122,371.52 | 0.00 | 122,371.52 |
| Sep-11 | 1245 | 8,000.35 | 0.00 | 8,000.35 |
| Sep-11 | 4877 | 106,467.05 | 0.00 | 106,467.05 |
| Sep-11 | 2759 | 136,527.33 | 0.00 | 136,527.33 |
| Oct-11 | 2759 | 155.00 | 0.00 | 155.00 |
| Nov-11 | 2759 | 10,000.00 | 0.00 | 10,000.00 |
| Nov-11 | | 76,984.05 | 76,984.05[7] | 0.00 |
| Dec-11 | 2759 | 28,366.65 | 0.00 | 28,366.65 |
| Mar-12 | | 87,378.83 | 87,378.83[8] | 0.00 |
| TOTALS | | 3,581,605.24 | 2,183,074.57 | 1,398,530.71 |

Momentum Contractors, Inc. paid a total of $ 2,136,080.77, for job specific

costs on the Sam's Club job. In addition, during the period it was performing the Sam's Club job, Momentum Contractors, Inc. paid several thousand dollars monthly for overhead office expenses to maintain on-going operations, including payments for a leased copier, telephones, a security service for the office, Federal Express, transportation expenses, waste disposal, payroll taxes, worker's compensation, and a small business loan. Fred Allen testified that he did not receive any salary from the Sam's Club job.

Tri-Temp sued Momentum and the Allens in state court in 2012. Tri-Temp obtained a Final Nunc Pro Tunc Judgment on June 3, 2013, in the amount of $159,973.90, against Momentum and the Allens jointly and severally.

## II. Conclusions of Law

### A. Pre-trial Proceedings

Tri-Temp moved for summary judgment on liability contending that the Allens are "collaterally estopped from re-litigating issues of ultimate fact which have been determined by a valid and final judgment issued in the State Court, and the corresponding Findings of Fact and Conclusions of Law" and that "there are no genuine issues of material fact regarding [the Allens'] liability for the claim." In its pretrial statement, Tri-Temp states, "This Court granted Plaintiff's motion for summary judgment in all respects except as to Defendants' scienter, which shall be

P:\Tri-Temp_amended 11_3_14.wpd          9

the subject of the trial." This Court did not, however, grant summary judgment in favor of Tri-Temp. The Court instead ruled that it will give preclusive effect to the facts stated in the state court's findings of fact 1- 68.[9] Further, the Court ruled that scienter of the Allens would be determined under the Supreme Court's standard announced in *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 1759-1760 (2013).

**B. Collateral Estoppel**

Tri-Temp contends that its judgment debt against the Allens is not dischargeable under 11 U.S.C.§§ 523(a)(2)(A) and 523(a)(4) and that the state court's findings of fact and conclusions of law preclude re-litigation of fraud or breach of fiduciary duty by the Allens. In *In re Gupta*, 394 F.3d 347, 349-350 (5th Cir. 2004), the Fifth Circuit analyzed the collateral estoppel effect of state court findings as follows:

> A bankruptcy court may apply collateral estoppel in a dischargeability proceeding to preclude relitigation of state court findings that are relevant to dischargeability. *See Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir.1997) (citing *Grogan v. Garner*, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991)). The ultimate determination of dischargeability is, however, a federal question. As we have elaborated, "The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *LSP Inv. Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir.1993) (relying on *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1335-41 (5th Cir.1980)).

*In re Gupta*, 394 F.3d 347, 349-350 (5th Cir. 2004).

Under Texas law, collateral estoppel may apply where (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. 394 F.3d at 350, n. 4. Collateral estoppel may apply to subsidiary facts actually litigated and necessarily decided in a prior judicial proceeding, but the recitals and conclusions contained in the state court judgment must be supported by detailed subsidiary facts sufficient as findings to meet the federal test of nondischargeability. *Matter of Shuler*, 722 F.2d 1253, 1256-58 (5th Cir.1984). Collateral estoppel cannot, however, attach to a non-existent finding. *In re Gupta*, 394 F.3d 347, 349 (5th Cir. 2004).The bankruptcy court should look at the entire record of the state proceeding, not just the judgment, to determine if the issue was actually litigated and was necessary to the decision in the state court. *Matter of Shuler*, 722 F.2d 1253, 1258 (5th Cir. 1984).

The state court made findings of fact and conclusions of law in favor of Tri-Temp and against Momentum Contractors, Inc. and the Allens. Tri-Temp did not, however, introduce the state court judgment, state court findings of fact, or state court trial transcript into the evidentiary record at trial of the instant matter. Parts of the state court record are, however, attached to Tri-Temp's motion for summary judgment or were otherwise uploaded and appear on the Court's docket sheet. The Court finds

that while the state court's findings of fact are preclusive as to any specific subsidiary

facts therein stated, the state court's findings of fact do not include any factual details

showing the acts committed by the Allens upon which the state court based its

conclusions that the Allens violated the Texas Construction Trust Fund Act. It is

detailed subsidiary facts shown by the state court record that serve to preclude re-

litigation of an issue, not the state court's conclusions of law, especially when as here,

the state court's conclusions consist of the wording of the statute modified to insert

the names of the defendants as violators. This Court finds that Tri-Temp's state court

findings of fact and conclusions of law do not show that the Allens committed acts

that constitute fraud or defalcation in a fiduciary capacity so as to create a non-

dischargeable debt under the Bankruptcy Code.

## C. 11 U.S.C. § 523(a)(2)(A)

Bankruptcy Code § 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b)
of this title does not discharge an individual debtor from any debt--
. . . .

(2) for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a
statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

P:\Tri-Temp_amended 11_3_14.wpd        12

"For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance." *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005). Tri-Temp has presented no evidence that its debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

### D. 11 U.S.C. § 523(a)(4)

Bankruptcy Code § 523(a) (4) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
. . . .
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . .

11 U.S.C. § 523(a)(4).

### 1. Fiduciary Capacity

Tri-Temp contends the Allens violated the Texas Construction Trust Fund Act. Tri-Temp contends that because its debt is based on a violation of the Texas Construction Trust Fund Act its judgment is nondischargeable under § 523(a)(4).

The Texas Construction Trust Fund Statute provides:

§ 162.001. Construction Payments and Loan Receipts as Trust Funds

(a) Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

(b) Loan receipts are trust funds under this chapter if the funds are borrowed by a contractor, subcontractor, or owner or by an officer, director, or agent of a contractor, subcontractor, or owner for the purpose of improving specific real property in this state, and the loan is secured in whole or in part by a lien on the property.

(c) A fee payable to a contractor is not considered trust funds if:

(1) the contractor and property owner have entered into a written construction contract for the improvement of specific real property in this state before the commencement of construction of the improvement and the contract provides for the payment by the owner of the costs of construction and a reasonable fee specified in the contract payable to the contractor; and

(2) the fee is earned as provided by the contract and paid to the contractor or disbursed from a construction account described by Section 162.006, if applicable.

(d) Trust funds paid to a creditor under this chapter are not property or an interest in property of a debtor who is a trustee described by Section 162.002.

Tex. Prop. Code § 162.001.

§ 162.002. Contractors as Trustees

A contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds.

Tex. Prop. Code § 162.002.

§ 162.003. Beneficiaries of Trust Funds

(a) An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

(b) A property owner is a beneficiary of trust funds described by Section 162.001 in connection with a residential construction contract, including funds deposited into a construction account described by Section 162.006.

Tex. Prop. Code § 162.003.

§ 162.005. Definitions

In this chapter:

(1) A trustee acts with "intent to defraud" when the trustee:

(A) retains, uses, disburses, or diverts trust funds with the intent to deprive the beneficiaries of the trust funds;

(B) retains, uses, disburses, or diverts trust funds and fails to establish or maintain a construction account as required by Section 162.006 or fails to establish or maintain an account record for the construction account as required by Section 162.007; or

(c) uses, disburses, or diverts trust funds that were paid to the trustee in reliance on an affidavit furnished by the trustee under Section 53.085 if the affidavit contains false information relating to the trustee's payment of current or past due obligations.

(2) "Current or past due obligations" are those obligations incurred or owed by the trustee for labor or materials furnished in the direct prosecution of the work under the construction contract prior to the receipt of the trust funds and are due and payable by the trustee no later

than 30 days following receipt of the trust funds.

(3) "Direct cost" means a cost included under a construction contract that is specific to the construction of the improvement that is the subject of the contract.

(4) "Indirect cost" means a cost included under a construction contract that is not specific to the construction of the improvement that is the subject of the contract.

Tex. Prop. Code § 162.005.

§ 162.031. Misapplication of Trust Funds

(a) A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds.

(b) It is an affirmative defense to prosecution or other action brought under Subsection (a) that the trust funds not paid to the beneficiaries of the trust were used by the trustee to pay the trustee's actual expenses directly related to the construction or repair of the improvement or have been retained by the trustee, after notice to the beneficiary who has made a request for payment, as a result of the trustee's reasonable belief that the beneficiary is not entitled to such funds or have been retained as authorized or required by Chapter 53.

(c) It is also an affirmative defense to prosecution or other action brought under Subsection (a) that the trustee paid the beneficiaries all trust funds which they are entitled to receive no later than 30 days following written notice to the trustee of the filing of a criminal complaint or other notice of a pending criminal investigation.

(d) A trustee who commingles trust funds with other funds in the trustee's possession does not defeat a trust created by this chapter.

Tex. Prop. Code §162.031.

"The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *In re Gupta*, 394 F.3d 347, 350 (5th Cir. 2004). "[T]he concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law." *In re Tran*, 151 F.3d 339, 342 (5th Cir. 1998). Whether a state statute creates a fiduciary relationship under § 523(a)(4) is a matter of federal law in which the federal court must examine the supposed fiduciary relationship created by the state statute to determine whether it possesses the attributes required under § 523(a)(4). *In re Tran*, 151 F.3d at 342-343. Under § 523(a)(4), "fiduciary" is limited to instances involving (1) express or technical trusts, (2) in which the purported trustee's duties arise independent of any contractual obligation, and (3) in which the trustee's obligations have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. *Id.* To meet the requirements of § 523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties. *Id.*

In *In re Nicholas*, 956 F.2d 110 (5th Cir. 1992), the Fifth Circuit assessed the 1987 amendment to Tex. Prop. Code § 162.031(a) that expanded the scienter requirement of the trustee to include one who acts intentionally or knowingly in addition to one who acts with intent to defraud. The Fifth Circuit held that despite the

P:\Tri-Temp_amended 11_3_14.wpd          17

broader scienter requirement, the act failed to create a fiduciary duty under § 523(a)(4). 956 F.2d at 111. The *Nicholas* court noted that despite broadening the scienter requirement of the trustee, the 1987 amendments also created affirmative defenses to a trustee's liability for misapplication of funds that "carefully refine the scope of coverage." 956 F.2d at 112. The *Nicholas* court held, "We conclude that because no fiduciary duty existed even under the 1987 amendments to the [Texas Construction Trust Fund Act], § 523(a)(4) does not bar the dischargeability of Coburn's debt." 956 F.2d at 111.

Since the Fifth Circuit's ruling in *In re Nicholas*, the Texas Construction Trust Fund Act has been amended, in pertinent part, to add requirements for construction accounts for written contracts to construct improvements to a residential homestead for an amount exceeding $5,000 and to add subsection § 162.031(d), which states, "(d) A trustee who commingles trust funds with other funds in the trustee's possession does not defeat a trust created by this chapter." *See* Tex. Prop. Code §§ 162.005, 162.006, 162.007, and 162.031(d).

In *Matter of Tran*, 151 F.3d 339, 343-344 (5th Cir. 1998), the Fifth Circuit elaborated on its prior rulings holding that the Texas Construction Trust Fund Act does not create the type of fiduciary relationship required under § 523(a)(4):

> In our previous cases, we have not expressly identified the particular "trust-like" duty-or combination of duties-that a state statute must

impose to create the specie of fiduciary that meets muster under §
523(a)(4). Nonetheless, one such duty has loomed large-the duty that a
trustee refrain from spending trust funds for non-trust purposes. Indeed,
on two occasions, the absence of such a requirement has proved
determinative. In *[In re] Boyle*, [819 F.2d 583 (5th Cir. 1987)] we
examined whether a contractor was a fiduciary under § 523(a)(4) by
virtue of the Texas Construction Trust Fund Statute. The version of the
that statute then in force specified that funds loaned or paid under a
construction contract to finance improvements on particular real
property were trust funds, and set forth criminal penalties for a
contractor or other trustee who, with the intent to defraud, used those
funds without paying fully his obligations to beneficiary. In rejecting the
argument that the statute constituted as fiduciaries all persons accepting
funds or loans under a construction contract, we stressed that the statute
prohibited the expenditure of trust funds for non-trust purposes only if
done with fraudulent intent.

[The construction fund statute] does not prohibit a fund holder from
paying, without any fraudulent intent, creditors on one project with
surplus funds left over from earlier work and then using funds provided
for that later project on still other work. In short, the statute does not
create "red," "blue," and "yellow" dollars each of which can only be
used for "red," "blue," or "yellow" construction

We held that, absent such an affirmative requirement, the subject statute
did not make fiduciaries out of all contractors for the purposes of §
523(a)(4), but rather made fiduciaries of only those contractors who
diverted funds with the intent to defraud.

In *Coburn Company of Beaumont v. Nicholas* [956 F.2d 110 (5th
Cir.1992) ], we were confronted with an amended version of the Texas
Construction Fund Statute featured in Boyle. Although the amended
statute broadened the scienter requirement to cover trustees who
"intentionally or knowingly" spent trust funds for non-trust purposes
before fully paying all legitimate obligations, it also provided
affirmative defenses that permitted a trustee to spend trust funds for
non-trust purposes under certain circumstances. As the amended version
of the statute, like its predecessor, did not expressly and totally prohibit

such expenditures, we again rejected the argument that the statute elevated every contractor who accepts funds or loans under a construction contract to a § 523(a)(4) fiduciary.

Our discussion of the significance of the absence of a statutory prohibition of spending putative trust funds for non-trust purposes does not suggest the converse, i.e., that the mere inclusion of such a prohibition would alone be sufficient to create a fiduciary relationship under the debt discharge exception. The absence of such a prohibition is telling, though, because without such a requirement, the supposed trustee appears not so much to be responsible for managing a beneficiary's funds on the beneficiary's behalf as to be engaged in a typical agency relationship.

Not only do the Act and the regulations promulgated under it fail to prohibit expressly a ticket sales agent from spending lottery ticket proceeds for non-lottery-i.e., non-trust-purposes; neither do they mandate that the agent must segregate lottery proceeds from his other funds. Clearly, the absence of this latter duty undercuts the argument that the Act seeks to prohibit an agent from spending trust funds for non-trusts purposes without expressly saying so. For, in the absence an express segregation requirement, it would be virtually impossible to monitor even an express spending prohibition, let alone one imposed sub silentio. Therefore, any suggestion that a fiduciary of § 523(a)(4) proportions is somehow conjured up by implication just does not hold water.

*In re Tran*, 151 F.3d 339, 343-345 (5th Cir. 1998) (footnotes omitted.)

Tri-Temp alleges that the Allens controlled Momentum's funds and that Momentum withdrew Walmart's payments from the Chase account into which Walmart electronically deposited the funds and used the money to pay operational expenses that were not expenses incurred specifically for the Sam's Club job. Tri-Temp implies that Momentum was required to maintain a dedicated bank account for

the Walmart funds for the Sam's Club job. The Texas Construction Trust Fund Act,

however, requires a dedicated account only for a contract to construct improvements

to a residential homestead for an amount exceeding $5,000. Therefore, a dedicated

account was not required under the Texas Construction Trust Fund Act for deposit

of Walmart's payments. *See* Tex. Prop. Code §162.006(a) ("A contractor who enters

into a written contract with a property owner to construct improvements to a

residential homestead for an amount exceeding $5,000 shall deposit the trust funds

in a construction account in a financial institution.") The Court finds that Tri-Temp

has not demonstrated that the Texas Construction Trust Fund Act imposes sufficient

trust-like duties on a contractor to meet the requirements of § 523(a)(4).

### 2. Defalcation and Intent

Even assuming the Texas Construction Trust Fund Act created a trust between

Momentum and Tri-Temp, under §523(a)(4), the term "defalcation" requires conduct that the

fiduciary knows is improper as well as reckless conduct of the kind set forth in the Model

Penal Code if the fiduciary consciously disregards or is willfully blind to a substantial and

unjustifiable risk that his conduct will turn out to violate a fiduciary duty. *Bullock v.*

*BankChampaign, N.A.*, 133 S.Ct. 1754, 1759 (2013) (citing ALI, Model Penal Code §

2.02(2)(c), p. 226 (1985).) "That risk 'must be of such a nature and degree that, considering

the nature and purpose of the actor's conduct and the circumstances known to him, its

disregard involves a gross deviation from the standard of conduct that a law-abiding person

would observe in the actor's situation.'"133 S.Ct. 1754 at 1759-1760.

As evidence of the Allens' scienter required by *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 1759-1760 (2013), Tri-Temp elicited testimony from the Allens to show that they knew it would be improper to do such things as to: (1) take funds from one project to pay off another project; (2) misappropriate any funds from a construction project; (3) divert funds that were paid by an owner for the work a subcontractor did to someone else in another project; (4) spend project funds in Las Vegas at the Mirage Hotel; (5) spend project funds to pay a child's tuition, overhead, Sirius radio, and L.A. Fitness, until the subcontractors have been paid for the work for which Momentum had already been paid; (6) divert funds from one project to another project; (7) spend project specific money in Las Vegas, at the liquor store, or for any of non-project specific expense; and (8) rob Peter to pay Paul. The Court finds that the Allens' agreement with Tri-Temps' counsel that such acts would theoretically not be proper is not evidence that the Allens committed any such acts or used any of the Sam's Club job trust funds to commit any such acts. The Court finds that there is no evidence that the Allens committed any of the acts that they agree it would be improper to do with construction trust funds. The Court finds that the Allens did not knowingly, intentionally and with the intent to defraud, retain or use trust funds related to the Sam's Club project for any expenses not authorized by the Texas Construction Trust Fund Statute. The Court finds that neither Fred Allen nor Judy

Allen acted with the scienter required under the *Bullock* standard.

The Court finds that Momentum paid only legitimate operational expenses and job specific expenses from Walmart's payments to Momentum for the Sam's Club job. Payment of operational overhead expenses from project funds does not violate the statute. "[G]eneral contractors may use the payments they receive from construction projects to keep those projects going even if, in some instances, the beneficiaries are not paid first." *In re Nicholas*, 956 F.2d at 113.

Further, under § 523(a)(4), the trustee may retain, use or disburse funds to pay the trustee's actual expenses directly related to the construction or repair of the improvement regardless of whether such expenses were owed to beneficiaries of the trust fund and regardless of whether the trustee raised such operational payments as an affirmative defense under the Texas Construction Trust Fund Statute. Federal law, although initially requiring the debtor to make a prima facie showing that he is entitled to a discharge, ultimately places the burden on the creditor to prove that the debt falls within the § 523(a)(4) exception. *In re Nicholas*, 956 F.2d at 114; *In re Swor*, 347 Fed .Appx. 113 (5th Cir.2009) ("Texas law does not require trust funds to be kept in separate accounts. Nor must these funds be spent only on the project for which they were received—they may be spent on other projects or on expenses related to general business overhead."); *see also* Op. Tex. Att'y Gen. No. JM–945

(1988) (Under Tex. Prop. Code § 162.031(b), actual expenses directly related to the construction or repair of the improvement include overhead and other expenses which, though not readily traceable to a particular job, are necessary to obtaining or completing the job, so long as such expenses have in fact been incurred.)

The two largest payments of which Tri-Temp complains are $4,322.47 paid to UTSA on May 9, 2011, and a withdrawal of $2,004.99, from an ATM at the Mirage Hotel, in Las Vegas, Nevada, on August 23, 2011. The Court finds that in addition to the deposits of Walmart trust funds in the amounts of $490,364.04 on March 24, 2011, and $585,915.03 on May 6, 2011, Momentum had received deposits from non-Walmart sources totaling $410,040.92 during the period of March through May, 2011. Further, Tri-Temp has offered no evidence that Momentum was in default to any beneficiary of the Walmart funds for current or past due obligations for work performed or materials furnished on the Sam's Club job as of May 9, 2011, the date of the payment to UTSA. Indeed, Tri-Temp's complaint judicially admits and the evidence shows that Momentum paid Tri -Temp timely and in full for all work performed by Tri-Temp through May 31, 2011. The Court finds that the Allens and Momentum used non-trust funds from non-Walmart sources to pay UTSA on May 9, 2011.

Similarly, in the month of August 2011, Momentum received a deposit from

non-Walmart sources in the amount of $122,371.52. The Court finds that the $2,004.99 withdrawn at an ATM at the Mirage Hotel, in Las Vegas, Nevada on August 23, 2011, was a withdrawal of non-trust funds from sources other than Walmart. This ATM withdrawal was not a misapplication of Walmart trust funds. The Court finds that all of the questioned charges total less than $10,000. The Court finds that all of the questioned charges were paid from non-trust funds deposited to Momentum's accounts totaling over $1,200,000.00, during the relevant time period. Federal law, although initially requiring the debtor to make a prima facie showing that he is entitled to a discharge, ultimately places the burden on the creditor to prove that the debt falls within the § 523(a)(4) exception. *In re Nicholas*, 956 F.2d at 114. The Court concludes that Tri-Temp failed to prove that its debt is not dischargeable under § 523(a)(4). Based on the foregoing, it is

**ORDERED** that the debt of Tri-Temp Refrigeration, Inc. is **DISCHARGED**.

Signed this 4th day of November, 2014 at Houston, Texas.

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE

1. Beginning balance of account number ending 4877.

2. First Walmart payment.

3.Second Walmart payment.

4.Third Walmart payment.

5.Fourth Walmart payment.

6.Fifth Walmart payment.

7.Sixth Walmart payment.

8.Seventh Walmart payment.

9.The state court findings of fact and conclusions of law are as follows:

FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.      Findings of Fact

1.      Tri-Temp Refrigeration, Inc. ("Tri-Temp") is a refrigeration equipment and services company based in Houston, Texas.

2.      Momentum Contractors, Inc. ("Momentum") is a construction general contractor based in Houston, Texas.

3.      Frederick Allen, Jr. is an officer of Momentum Contractors, Inc.

4.      Judy Allen is an officer of Momentum Contractors, Inc.

5.      Tri-Temp and Momentum entered into a Subcontractor Agreement ("Contract") on January 4, 2011.

6.      Tri-Temp agreed to provide refrigeration equipment and services to Momentum for the Sam's Club remodel project located at 2000 Westview Blvd., Conroe, Texas 77304 ("the Project") for an original contract price of $396,000.7.  Momentum was the general contractor for the Project .

8.      Tri-Temp was a subcontractor for the Project .

9.      The owner of the Project was Wal-Mart Stores, Inc. ("Wal-Mart").

10.     Tri-Temp's scope of work under      the Contract increased due  to additional work it was required to perform.

11.    The additional work performed by Tri-Temp was memorialized m Change Orders submitted by Tri-Temp to Momentum.

12.    The total amount billed by Tri-Temp to Momentum for the additional change orders is $82,478.70.

13.    The Change Orders submitted by Tri-Temp to Momentum were submitted on the Wal-Mart forms provided to Tri-Temp by Momentum. See Plaintiff s Exhibit 5.

14.    Tri-Temp submitted Subcontractor Applications for Payment for the services and equipment it provided.

15.    The Subcontractor Applications for Payments submitted by Tri-Temp to Momentum were submitted on the Exhibit "B" forms provided by Momentum to Tri-Temp. See Plaintiff s Exhibit 2A-2E.

16.    Momentum paid Tri-Temp a total of $320,760.00 for Tri-Temp's first three (3) payment applications.

17.    After Momentum paid Tri-Temp's third payment application, there remained an unpaid contract balance of $75,240.00, which included $39,600.00 in retainage.

18.    Tri-Temp's fourth application for payment it submitted to Momentum in the amount of $35,640.00 . See Plaintiff s Exhibit 2D.

19.    Momentum did not pay Tri-Temp's fourth payment application in the amount of $35,640.00 .

20.    Tri-Temp's fifth application for payment it submitted to Momentum in the amount of $122,078. 70. See Plaintiff s Exhibit 2D.

21.    Momentum did not pay Tri-Temp's fifth payment application in the amount of $122,078.70, which included the $39,600.00 in retainage and $82,478.70 for work performed pursuant to three (3) change orders.

22.    Tri-Temp submitted a change order to Momentum in the amount of $38,181.00 for the additional scope of work to add a fourth island. See Plaintiff s Exhibit 5.

23.     Tri-Temp has applied a credit to the Momentum account for the additional scope of work to add a fourth island and is only seeking to recover $19,090.00 which remains unpaid by Momentum for Tri- Temp's performance of work regarding the addition of the fourth island.

24.     Momentum submitted Change Order Number 10 to Wal-Mart for the additional scope of work for Tri-Temp to add a fourth island. See Plaintiff's Exhibit 7B.

25.     Wal-Mart signed Change Order Number 10 approving Tri-Temp's additional scope of work to add a fourth island. See Plaintiff's Exhibit 7B.

26.     Tri-Temp submitted a change order to Momentum in the amount of
$1,394.78 for the additional scope of work to remove equipment from the old rack houses. See Plaintiff's Exhibit 5.

27.     Momentum submitted Change Order Number 6 to Wal-Mart for the additional scope of work for Tri-Temp to remove equipment from the old rack houses. See Plaintiff's Exhibit 7C.

28.     Wal-Mart signed Change Order Number 6 approving Tri-Temp's additional scope of work to remove equipment from the old rack houses. See Plaintiff's Exhibit 7C.

29.     Momentum submitted Payment Application 7R to Wal-Mart on February 18, 2012, which included an application for payment of (a) Change Order Number 6 for Tri-Temp's additional scope of work to remove equipment from the old rack houses, and (b) Change Order Number 10 for Tri-Temp's additional scope of work to add a fourth island. See Plaintiff's Exhibit 8.

30.     Wal-Mart paid Momentum for Payment Application 7R on March 15, 2012, which included payment for Tri-Temp's additional scope of work to (a) remove equipment from the old rack houses and (b) add a fourth island. See Plaintiff's Exhibit 8 and Defendant's Exhibit 5.

31.     Momentum failed to pay Tri-Temp for the change order for the additional scope of work to add a fourth island.

•         •

32.     Momentum failed to pay Tri-Temp for the change order for the additional scope of work to remove equipment from the old rack houses .

33.     Tri-Temp submitted a change order to Momentum in the amount of
$62,542. 74 for the additional scope of work to store refrigeration equipment. See Plaintiff s Exhibit 5.

34.     Momentum submitted Change Order Number 1 to Wal-Mart for the additional scope of work for Tri-Temp to store refrigeration equipment. See Plaintiff s Exhibit 7A.

35.     Wal-Mart signed Change Order Number 1 approving Tri-Temp's additional scope of work to store refrigeration equipment. See Plaintiff s Exhibit 7A.

36.     Momentum submitted Payment Application 6 to Wal-Mart on October 18, 2011, which included an application for payment of Change Order Number 1 for Tri-Temp's additional scope of work to store refrigeration equipment. See Plaintiff s Exhibit 8.

37.     Wal-Mart paid Momentum for Payment Application 6 on November 15, 2011, which included payment for Tri-Tem p's additional scope of work to store refrigeration equipment. See Plaintiff s Exhibit 8 and Defendant's Exhibit 5.

38.     Momentum failed to pay Tri-Temp for the change order for the additional scope of work to store refrigeration equipment.

39.     Tri-Temp was forced to rent a crane for one service more than what was provided for in its scope of work for the Project due to the fact Momentum did not have the pad site ready on the day the equipment arrived for which the crane would be utilized to place a piece of refrigeration equipment on the concrete pad. See Plaintiff s Exhibit 2F.

40.     The cost to Tri-Temp for the additional crane rental was $2,255.20 . See
Plaintiff s Exhibit 2F.

41.     If not for Momentum's failure to adhere to Wal-Mart's construction schedule with regard to when the pad site was to be ready, then Tri- Temp

•      •      would not have incurred the additional crane expense of
$2,255.20.

42.    Tri-Temp sent an invoice to Momentum for the additional crane
rental on May 24, 2011 in the amount of $2,255.20.

43.    Momentum did not pay Tri-Temp the cost for the additional crane
rental in the amount of $2,255.20.

44.    Pursuant to the testimony of Frederick Allen , Jr. and Plaintiff s
Exhibit 13, as of July 30, 2012 all outstanding change order issues were
resolved between Wal-Mart and Momentum.

45.    There are no negative change orders or backcharges signed by Wal-
Mart entered into evidence in this case.1

46.    Defendants have not pled the affirmative defenses of offset, credit or
first material breach.

47.    Momentum was paid by Wal-Mart for all of the work Tri-Temp
performed on the Project except retainage in the amount of $39,600.00.

48.    Multiple liens and bond claims were filed by Momentum's
subcontractors against the Project.

49.    Wal-Mart has not paid retainage to Momentum because
Momentum has failed to clear up and have removed any and all liens and
bond claims filed against the Project.

50.    Tri-Temp completed its scope of work, including all change order
work, pursuant to the Contract.

51.    Momentum did not dispute the quality of the equipment and services
provided by Tri-Temp for the Project.

52.    There were no deficiencies in the work performed by Tri-Temp on
the Project.

53.    Frederick Allen, Jr. and Judy Allen controlled and directed the funds
paid by Wal-Mart to Momentum for the Project.

54.    Momentum opened a separate account at Chase in which to deposit funds it was paid by Wal-Mart for the Project.

55.    Momentum deposited funds from the Project into the account at Chase dedicated to the Project.

56.    The Chase bank statements produced by Momentum evidence that Momentum paid non-Project related expenses using the funds from the account dedicated to the Project.


1 While there were no negative change orders or backcharges approved by Wal-Mart entered into evidence, and Defendants have not pled offset or credit as an affirmative defense, if the Court is still inclined to consider a negative change order or backcharge relating to Tri-Temp, Tri-Temp submits that the only evidence admitted regarding an amount agreed to by Wal-Mart and Momentum for Division 15 is -$15,607.63, which could apply to Tri-Temp or any other mechanical subcontractor which worked u nder Division 15 - Mechanical for this Project.

57.    Prior to paying Tri-Temp for the labor and materials it provided to the Project, funds from the Momentu m account at Chase dedicated to the Project were used to pay non-project related expenses.

58.    With thirty (30) days of Momentu m's receipt of funds from Wal-Mart for the work performed by Tri-Temp for the Project, Momentum failed to pay said funds to Momentum.

59.    The equipment and services provided by Tri-Temp were utilized by Momentum for the benefit of the Project.

60.    Tri-Temp remains unpaid in an amount not less than $159,973.90 for the equipment and services it provided to the Project.

61.    All conditions precedent to Tri-Tem p's claims and suit have occurred or been performed or satisfied, if not excused.

62.    Tri-Temp made demand upon Momentu m for $159,973.90 for the equipment and services it provided to the Project.

63.    Article 14.6 of the Contract provides that the prevailing party is

entitled to recover reasonable costs, attorney's fees.

64.    Tri-Temp hired Andrews Myers, PC to pursue its claims in this case.

65.    Andrews Myers, PC has charged Tri-Temp hourly for its services and invoiced Tri-Temp for the time spent on the case, in addition to fees incurred on Tri-Temp's behalf.

66.    Tri-Temp    incurred    reasonable    attorney    fees    inthea mount        of
$27,944.00 in prosecuting its claims against Defendants    and m defending Defendants' counterclaims through trial.

67.    Prejudgment interest on Tri-Temp's claim began accruing on December 30, 2011 and will continue to accrue through the date of judgment at a rate of 5% per annum.

68.    Tri-Temp has proven its claims by a preponderance of the evidence and prevails on all its causes of actions, defenses and affirmative defenses against Defendants.

69.    Defendants failed to prove by a preponderance of the evidence any of their causes of action, defenses and affirmative defenses against Tri-Temp.

70.    Any Finding of Fact which is actually a Conclusion of Law shall be deemed a Conclusion of Law. Any Conclusion of Law which is actually a Finding of Fact shall be deemed a Finding of Fact.

II.    Conclusions of Law

1.    The parties reached an agreement on the equipment and services to be supplied by Tri-Temp and the price (the "Contract").

2.    Momentum is obligated to pay Tri-Temp for the equipment and services furnished to the Project.

3.    Momentum was bound by the terms of the Contract.

4.    Tri-Temp substantially complied with the terms of the Contract.

5.     Momentum breached the Contract in failing to pay for the equipment and services provided by Tri-Temp.

6.     Momentum was not excused for its breach.

7.     Momentum's breach caused Tri-Temp damages.

8.     Pursuant to Section 56.051 of the Texas Business and Commerce Code, the contingent payment clause(s) in Article 5 of the Contract is unenforceable due to the fact Wal-Mart's non- payment to Momentu m is the result of the contractual obligations of Momentum not being met, and not due to any failure of Tri-Temp to meet its contractual requirements.

9.     The release and waiver of lien executed by Tri-Temp is invalid due to a lack of consideration from Momentu m.

10.    Momentum's breach caused Tri-Temp damages m the amount of
$159,973.90.

11.    The damages incurred by Tri-Temp in the amount of $159,973.90 were directly caused by Momentum's breach.

12.    The money paid to Momentum by Wal-Mart constitutes trust funds pursuant to Section 162.001 of the Texas Property Code.

13.    Momentum is a trustee of construction trust funds pursuant to Section 162.002 of the Texas Property Code because it is a general contractor who received trust funds for the Project from Wal-Mart.

14.    Frederick Allen, Jr. and Judy Allen are trustees of construction funds pursuant to Section 162.002 of the Texas Property Code because they are officers of Momentum who had control or direction of the trust funds received from Wal-Mart for the Project.

15.    Pursuant to Section 162.003 of the Texas Property Code, Tri-Temp is a beneficiary of the trust funds received by Momentum from Wal-Mart for the Project because Tri-Temp is a subcontractor who provided labor or material for the construction or repair of an improvement on specific real property in Texas.

16.     Pursuant to Sections 162.031(a) and 162.005(1)(B) and (2) of the Texas Property Code, Judy Allen and Frederick Allen, Jr. misapplied the trust funds paid to Momentum by Wal-Mart for the Project because they retained, used, disbursed and diverted trust funds without first fully paying all current or past due obligations due by Momentum to Tri-Temp for the labor and material furnished by Tri-Temp in direct prosecution of the work under the Contract.

17.     Pursuant to Sections 162.031(a) and 162.00S(l)(B) and (2) of the Texas Property Code, Judy Allen and Frederick Allen, Jr. misapplied the trust funds paid to Momentum by Wal-Mart for the Project because they did not pay Tri-Temp, within thirty (30) days of receiving the trust funds, for the labor and material furnished by Tri-Temp in direct prosecution of the work under the Contract.

18.     Frederick Allen, Jr. and Judy Allen are liable to Tri-Temp for violation for the Texas Construction Fund statute in the amount of $159,973.90.

19.     Momentum, Frederick Allen, Jr., and Judy Allen are jointly and severally liable to Tri-Temp.

20.     Tri-Temp is the prevailing party.

21.     Tri-Temp is entitled to recover attorney's fees and costs pursuant to the Article 14.6 Contract.

22.     The attorney fees and costs incurred by Tri-Temp were reasonable for the services performed, and the services performed were necessary for the prosecution of this matter, as evidenced by the oral testimony of Lisa M. Norman.

23.     Tri-Temp is awarded attorney's fees and costs m the amount of $27,944.00.

24.     Tri-Temp is entitled to prejudgment interest at a rate of 5% per annum accruing from December 30, 2011 until the date of judgment .

25.     Tri-Temp is entitled to post-judgment interest at a rate of 5% per annum .

26.     Defendants are not entitled to recover any damages and have no right to recovery.

27.     Because Defendants are not entitled to any damages and have no right to recovery, they are not entitled to attorney's fees.

28.     Any Finding of Fact which is actually a Conclusion of Law shall be deemed a Conclusion of Law. Any Conclusion of Law which is actually a Finding of Fact shall be deemed a Finding of Fact.

Judgment should be entered in favor of Tri-Temp in conformity with these Findings of Fact and Conclusions of Law. Judgment should further be entered that Defendants take nothing on their Counterclaims.